IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

```
_____
                                    )
K.S-A, a minor, and J.S-A, a minor  )
by and through Joshua Douglas       )
Franklin, as their Guardian Ad      )
Litem                               )
                                    )
                    Plaintiffs,     )
vs.                                 ) Civ. No. 16-00115 ACK-KJM
                                    )
STATE OF HAWAII, DEPARTMENT         )
OF EDUCATION                        )
                                    )
                    Defendant.      )
_____)
```

<u>ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

For the reasons set forth below, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment, ECF No. 109.

<u>FACTUAL BACKGROUND</u>

K.S-A and J.S-A ("Plaintiffs") are Native Hawaiian minor male children who assert that they have suffered harassment on the basis of sex in violation of Title IX of the Education Amendment of 1972. <u>See generally</u> Motion, ECF No. 109. Plaintiffs were 7 and 6 years old, respectively, when the harassment allegedly started and are now 12 and 11 years old. Mot. at 1, ECF No. 109-1. Plaintiffs attended public elementary schools which are part of the Hawaii School District and are recipients of federal funding. Pl. Concise Statement of Facts ¶¶ 1-2, ECF No. 110 ("Pl. CSF"). Plaintiffs attended Hilo Union Elementary from approximately April, 2012 to April 1, 2015.

Def. Concise Statement of Facts ¶ 1, ECF No. 114 ("Def. CSF").

Plaintiffs attended Waiakeawaena Elementary School from

approximately May 5, 2015 to May 15, 2015.  Id.  Plaintiffs next

attended Kua O Ka La New Century Public Charter School until

approximately October, 2016, when they were enrolled in Pahoa

Elementary.  Id. ¶ 25; Pl. CSF ¶ 26.  Plaintiffs then enrolled

in Waiakea Elementary on November 30, 2016.  Def. CSF ¶ 25.

While at Hilo Union, Waiakeawaena, Kua O Ka La, and

Pahoa, Plaintiffs claim that they have regularly been subjected

to student-on-student harassment, including being called "girl,"

"fag," "faggot," "gay," and "queer."  Pl. CSF ¶¶ 3, 6, 26, 30.

This allegedly harassing conduct took place on school premises

either during school hours or in after school programs on school

property.  Id. ¶ 5.  The conduct also escalated to physical

contact on a few occasions.  Id. ¶ 7.

Plaintiffs claim they reported the harassing conduct

to school officials, and assert that some of the conduct took

place in front of school officials.  Id. ¶¶ 8-9.  However,

Plaintiffs claim that the harassing conduct continued even after

their reports and complaints.  Id. ¶ 14.  In addition,

Plaintiffs assert that no steps were taken to remedy the

harassment, no formal investigation was made into the

complaints, and the only training on LGBTQ issues was untimely

and not relevant to addressing the harassment.  Id. ¶¶ 20-22, 32-

39.  As a result of these issues, Plaintiffs claim they fell behind in school and transferred schools multiple times.  See id. ¶¶ 1, 18, 26, 30.

## PROCEDURAL BACKGROUND

On March 15, 2016, Plaintiffs, by and through their biological father Joshua Douglas Franklin as their Guardian Ad Litem, filed a Complaint against Hawaii School District, Hilo-Waiakea Complex, Brad Bennett, and Erin Williams.  Compl., ECF No. 1.  On August 22, 2017, Plaintiffs filed their First Amended Complaint solely against Hawaii School District.  Am. Compl., ECF No. 72.  On September 1, 2017, Hawaii School District filed a motion to dismiss the First Amended Complaint.  ECF No. 73. The Court granted the motion to dismiss on December 18, 2017. ECF No. 101.  Plaintiffs filed their Second Amended Complaint on January 16, 2018, alleging two claims against the State of Hawaii, Department of Education ("Defendant"): a violation of Title IX of the Education Amendment of 1972 ("Title IX") and a claim for negligent infliction of emotional distress.  See generally Second Am. Compl., ECF No. 106.

On March 1, 2018, Plaintiffs filed a Motion for Partial Summary Judgment regarding their Title IX claim.  ECF No. 109-1 ("Mot.").  Defendant filed its Opposition on April 16, 2018.  ECF No. 113 ("Opp.").  Plaintiffs filed their Reply on April 23, 2018.  ECF No. 115 ("Reply").

The Court held a hearing on Plaintiffs' Motion on May 7, 2018.

<h2 style="text-align:center">**STANDARD**</h2>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure ("Rule") 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Broussard v. Univ. of Cal., 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citing Celotex, 477 U.S. at 323); see also Jespersen v. Harrah's Operating Co., 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a

genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (citing Anderson, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. Matsushita Elec. Indus. Co., 475 U.S. at 587; see also Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor") (internal citation and quotation omitted).

## DISCUSSION

Plaintiffs have moved for partial summary judgment on their Title IX claim and explicitly reserved for trial their claim for infliction of emotional distress. See Mot. at 1, ECF No. 109; Reply at 1 n.1. The Court will therefore only address

the Title IX claim and will not discuss Defendant's arguments concerning the emotional distress claim.  <u>See</u> Opp. at 13.

## I.    Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," with certain exceptions not applicable here.  <u>See</u> 20 U.S.C. § 1681(a); <u>see also</u> <u>Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 638 (1999).  There is an implied private right of action under Title IX allowing plaintiffs to file directly in court. <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 555 U.S. 246, 255 (2009). The Supreme Court has held that "the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference...to sexual harassment of a student by another student."  <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 173 (2005) (citing <u>Davis</u> and <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290-91 (1998)).

Same-sex harassment claims are cognizable under Title IX, and resolution of such claims is guided by Title VII principles, which the Supreme Court has interpreted to prohibit same-sex harassment.  <u>See, e.g.</u>, <u>Sanches v. Carrolton-Farmers Branch Indep. Sch. Dist.</u>, 647 F.3d 156, 165 (5th Cir. 2011)

(citing Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002); Roe ex rel. Callahan v. Gustine Unified Sch. Dist., 678 F. Supp. 2d 1008, 1026 (E.D. Cal. 2009). In addition, as in Title VII cases, harassment motived either by actual gender or failure to conform with gender stereotypes may form the basis of a Title IX claim.  See, e.g., Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1048 (7th Cir. 2017).  Wolfe v. Fayetteville, Ark. Sch. Dist., 648 F.3d 860, 867 (8th Cir. 2011); Videckis v. Pepperdine Univ., 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015); see also Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (holding that Title VII harassment could be based on perceived non-conformance to socially-constructed gender norms).

Davis set forth four requirements for the imposition of school district liability under Title IX for student-on-student harassment: (1) the school district "'exercise[d] substantial control over both the harasser and the context in which the known harassment occurs;'" (2) the plaintiff must suffer "'sexual harassment...that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school;'" (3) the school district had "'actual knowledge' of the harassment;" and (4) the school district's "deliberate

indifference subjects its students to harassment.'"  Reese v.
Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 739 (9th Cir. 2000)
(quoting Davis, 526 U.S. at 644-650) (alternation in original).
The Court will address each of these elements in turn.

A. Substantial Control

Substantial control can be found where the alleged
misconduct occurs during school hours and on school grounds
because the school district retains substantial control over the
context in which the harassment took place and over the alleged
harasser, by virtue of the degree of supervision and control
exercised over students in this setting.  See Davis, 526 U.S. at
646.  Substantial control has also been found where the alleged
harassment occurred at a football camp, which was not held on
school grounds, but which was sponsored and promoted by the
school, was a core part of the school's football program, was
under the supervision of the school's teachers and coaches, and
students were transported to the camp on the school's buses.
Callahan, 678 F. Supp. 2d at 1025.

Plaintiffs' evidence shows that most of the allegedly
harassing incidents took place during school hours and on school
grounds, see Pl. CSF ¶ 5, and Defendant has not disputed
substantial control over these events.  However, Defendant does
dispute that it bears responsibility for anything that occurred
at after-school programs and particularly the two acts of

- 8 -

physical violence against K.S-A and J.S-A allegedly occurring there.  Opp. at 12; see also Def. CSF ¶¶ 5-7.

First, K.S-A testified that during A Plus, an after-school program that was held in the cafeteria at Hilo Union Elementary School,[1] another student jumped on him, slammed his head into a pole, and gave him a black eye.  Pl. CSF ¶¶ 5, 7 & Ex. C at 55:2-56:24 (incident took place during the A Plus program in the cafeteria), 57:11-18 (after incident, teachers told him to sit in the cafeteria and gave him an ice pack).[2]  The Court notes that the record does not establish whether the A Plus program is affiliated with the DOE.[3]  Rather, Defendant

---

[1] At this time, K.S-A appears to have been attending a different school, but came to Hilo Union for the A Plus program.  See Pl. CSF, Ex. C at 55:20-56:10.

[2] Defendant has challenged Plaintiffs' exhibits C-E for lack of proper authentication, as the excerpts did not include the witness oaths and reporters certifications.  Opp. at 7-8. Defendants are correct that these must be included for deposition excerpts to be considered on summary judgment.  See Orr v. Bank of Am., N.T. & S.A., 285 F.3d 764, 773 (9th Cir. 2002); Varela v. S.F. City & Cty., No. C 06-01841 WHA, 2007 WL 205069, at *2 (N.D. Cal. Jan. 25, 2007).  However, Plaintiffs provided on reply the pages of the depositions showing the oath and certification for each of their excerpts.  Reply, Ex. D. The Court will allow this supplementation and therefore decline Defendant's request to disregard these exhibits.

[3] Defendant stated without citation that it has no responsibility for A Plus, Opp. at 12, but the Court notes that the Hawaii Department of Education ("HDOE") website suggests that A Plus is an HDOE program.  Hawaii State Department of Education, After School Programs, http://www.hawaiipublicschools.org/BeyondTheClassroom/AfterSchoolPrograms/Pages/Home.aspx (last accessed April 17, 2018).  See also Doe ex rel. Doe v. State of Haw. Dep't of Educ., 351 F. (Continued...)

appears to contend that Plaintiffs were attending the Boys and Girls Club of Hilo, instead of the A Plus program. See Def. CSF, Declaration of Erin Williams ("Williams Decl.") ¶ 6 (Plaintiffs "went to the Boys and Girls Club of Hilo after school ended for the day").

However, taking this as true, Defendant has only disputed which program Plaintiffs were attending, not where the alleged incidents occurred. Defendant admits that the Boys and Girls Club staff would first come to Hilo Union and gather in a central area before taking the participating students to their facility 2-3 blocks away. Id. ¶ 12. A reasonable factfinder cannot infer from evidence that the Boys and Girls Club first meets at Hilo Union and then goes to a separate location that an incident of physical violence which occurred during that program must have taken place off campus. This is particularly true given K.S-A's specific testimony that the incident occurred in the Hilo Union cafeteria, which Defendant has not specifically disputed. See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a general issue of material fact."); Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081-82 (9th Cir.

---

Supp. 2d 998, 1002 (D. Haw. 2004) (Kay, J.) (describing A-Plus as a "program of the Hawaii DOE").

1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").  As such, there is no genuine dispute as to where this incident occurred.

Finally, while Defendant states that it has no authority over the club, it also indicates that its responsibility over participating students only ends when they leave Hilo Union Campus.  See Def. CSF, Williams Decl. ¶ 12.  A reasonable trier of fact thus could not find that Defendant did not have substantial control over the context in which the incident occurred.

As to J.S-A, he testified that while he was walking up the stairs at Hilo Union, an older boy choked him and slammed him to the floor.  Pl. CSF ¶ 7 & Ex. D at 15:10-17.  The record does not show whether this incident took place during school hours or in an after-school program.  As such, Defendant's evidence about after-school programs does not create a genuine dispute of fact that this incident occurred on school grounds. And since Defendant states that its responsibility for students only ends when students leave campus, as noted above, a reasonable trier of fact could not find Defendant lacked substantial control over this incident.

Accordingly, the Court finds that there is no genuine dispute of material fact that Defendant had substantial control over any incidents of alleged harassment which took place on

school grounds and during school hours, including the two incidents of physical violence discussed above.

B. Harassment Causing Deprivation of Educational Opportunities

To establish the second element of Title IX liability, sexual harassment must be "'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" Reese, 208 F.3d at 739 (quoting Davis, 526 U.S. at 650). "Whether gender-oriented conduct is harassment depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to the ages of the harasser and the victim and the number of individuals involved." Davis, 526 U.S. at 651 (internal citation and quotation omitted). The Supreme Court has cautioned that "[c]ourts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." Id.

At least one court has recognized that a single incident can satisfy a Title IX claim, depending on the circumstances. See Vance v. Spencer Cty. Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000) (recognizing that "one incident can satisfy a claim" but finding that the record before the

court showed multiple incidents, including physical contact and attempts to take off plaintiff's clothes). However, "[d]amages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender." Davis, 526 U.S. at 652.

### 1. *Severe, Pervasive, and Objectively Offensive Harassment*

Plaintiffs argue that they suffered harassment on an almost daily basis for the three years prior to bringing this suit. Mot. at 17. The claimed harassment appears to largely center on the use of derogatory terms towards Plaintiffs such as "fag," "faggot," "gay," "queer," and "girl," as well as comments like the "whole family is a bunch of gays and whores" and are "going to hell," in addition to the two instances of physical contact. See Pl. CSF ¶¶ 3, 7.

Courts have held that the mere use of words with sexual connotations, such as "gay" or "bitch," are insufficient on their own to suggest harassment on the basis of gender. See, e.g., Preston v. Hilton Cent. Sch. Dist., 876 F. Supp. 2d 235, 243 (W.D.N.Y. 2012); Patenaude v. Salmon River Cent. Sch. Dist., No. 3:03-cv-1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005); see also Diebold v. Hartford Pub. Schs., Case No. 1:15-cv-529, 2017 WL 4512575, at *6 (W.D. Mich. May 25, 2017) (collecting cases). Courts have been cautious in avoiding broad

generalizations or assumptions of such words since the Supreme Court has stated it has never held that harassment "'is automatically discrimination because of sex merely because the words used have sexual content or connotations.'" Patenaude, 2005 WL 6152380, at *5 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).  However, multiple lewd comments and gestures by other students on a daily basis may be more than simple acts of teasing and name-calling.  See Annamaria M. v. Napa Valley Unified Sch. Dist., No. C 03-0101 VRW, 2006 WL 1525733, at *3 (N.D. Cal. May 30, 2006) (finding severe and pervasive harassment sufficiently alleged).

Courts have also noted that "[t]he issue is more subtle in the school context because 'at least early on, students are still learning how to interact appropriately with their peers.'"  Doe v. Galster, 768 F.3d 611, 617 (7th Cir. 2014) (quoting Davis, 526 U.S. at 651 in a Title VI race discrimination case).  According to one court, words like "fag" and "gay" when used by elementary and middle school students "do not necessarily mean that plaintiff was harassed because of [] perceived homosexuality...."  A.E. ex rel. Evans v. Harrisburg Sch. Dist. No. 7, No. 6:11-CV-06255-TC, 2012 WL 4794314, at *2 (D. Or. Oct. 9, 2012).  That court thought that "[i]t should come as no shock that elementary and middle school children call each other 'gay' and 'fag' quite often.  However, they rarely

mean it literally.  And such expressions can oftentimes be any of a number of generic interchangeable insults." Id. (denying summary judgment based in part on evidence that in addition to gendered words, other non-gendered insults, such as "motherfucker" and "asshole" had been used, and the plaintiff thought he was picked on for reasons other than perceived homosexuality) (internal citation and quotation omitted).

There appears to be little direct evidence in the record concerning whether the alleged harassers were using words like "gay" and "fag" as generic, interchangeable insults or whether intended to use such words because of their gender-based meaning.  The Court notes that there does not appear to be evidence that non-gendered words were used as insults towards Plaintiffs.[4]  In addition, one of the insults directed at Plaintiffs was that the "whole family is a bunch of gays and whores," and Plaintiffs' father openly identifies as gay. Declaration of Joshua Douglas Franklin ("Franklin Decl.") ¶ 1; Pl. CSF ¶ 3.  This supports that the insults were intended to have a gendered meaning.

It appears undisputed that K.S-A understood the meaning of the words used.  See Def. CSF ¶ 4; see also Pl. CSF,

---

[4] At the hearing, the Court misstated that the record contained evidence of non-gendered words being used as insults towards Plaintiffs.

Ex. C at 47:5-17 (explaining K.S-A's understanding of the words).  However, Defendant disputes that J.S-A understood the meaning of the words at the time they were used.  Def. CSF ¶ 4; Pl. CSF, Ex. D at 28:14-23 (explaining that J.S-A did not understand the meaning until after he had left Hilo Union).  The Court notes that there is evidence that J.S-A understood that he was called a girl at Hilo Union because of his long hair.  Pl. CSF, Ex. D at 37:19-38:8.

Regardless, Defendant contends that Plaintiffs' understanding is not material.  Def. CSF ¶ 4.  However, a reasonable trier of fact could find Plaintiffs' understanding to be relevant to whether the incidents here constituted harassment, as it suggests that the meaning of the words was known in this context, despite the ages of the children involved.  However, as harassment "depends on a constellation of surrounding circumstances," Davis, 526 U.S. at 651, the Court turns to the other parts of the record bearing on this question.

K.S-A testified that other kids called him "gay," "faggot," and "queer" on a daily basis in fourth grade and fifth grade.  Pl. CSF, Ex. C at 46:7-47:7, 51:21-52:4.  He also testified in more detail about three particular incidents: an incident in Lori Elloso's class at Hilo Union; an incident in Marianne Valentin's class at Waiakeawaena; and an incident during the A Plus program held at Waiakeawaena.  See generally

id. J.S-A testified that other students called him a "faggot,"
and, before he cut his long hair, a "girl," such as in the
incident of physical violence discussed above. See generally
Pl. CSF, Ex. D. Most of the alleged incidents occurred at Hilo
Union and Waiakeawaena, but Plaintiffs claim it continued at Kua
O Ka La New Century Public Charter School and Pahoa Elementary.
Franklin Decl. ¶¶ 2, 17-18, 21.[5] The Court will address
incidents at each school in turn.

First, as to events at Hilo Union, there is no genuine
dispute of fact that there were some reported incidents of
derogatory name-calling involving K.S-A. See Def. CSF,
Declaration of Rory Souza ("Souza Decl.") ¶¶ 6-8 (describing
that K.S-A reported incidents of derogatory name-calling);
Williams Decl. ¶¶ 8-11 (describing awareness of 5 incidents of

---

[5] Defendant has objected to numerous paragraphs in Mr. Franklin's
declaration as inadmissible hearsay. See Opp. at 7, 9-10. The
Court notes that Defendant's generic explanation of the
objection is not tailored to particular statements in the
declaration, and rather cursorily claims the statements are
being used to prove the truth of the matter. Defendant's
explanation fails to account for the fact that many of the
paragraphs at issue contain statements by DOE officials which
may qualify as non-hearsay opposing party statements under
Federal Rule of Evidence 801(d)(2). See, e.g., Franklin Decl.
¶¶ 5, 6, 8, 13, 16, 18, 22. Moreover, under Federal Rule of
Civil Procedure 56, as long as the contents of Mr. Franklin's
declaration would be admissible at trial, it does not have to be
in an admissible form on summary judgment. See Fraser v.
Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003). The Court is
not convinced that the contents of Mr. Franklin's declaration
could not be presented in an admissible form at trial and thus
declines to disregard the portions objected to.

name-calling involving K.S-A).  In addition, both incidents of physical violence discussed above occurred at Hilo Union.

However, Defendant disputes that these incidents rose to the level of severe and pervasive harassment, instead contending, at least as to K.S-A, that derogatory name-calling did not occur on a daily basis.  Def. CSF ¶ 6; Souza Decl. ¶ 7 ("I cannot attest that K.S-A was called derogatory names on a weekly basis."); Williams Decl. ¶ 11 (aware of only 5 incidents of name-calling); Declaration of Patti Andrade-Spencer ("Spencer Decl.") ¶¶ 6-9 (K.S-A did not report any incidents to her during her time as principal).  Defendant also casts doubt on K.S-A's reports of incidents, implying that derogatory words were not always used, even when Plaintiffs claimed they were.  See Souza Decl. ¶ 8 (describing that in investigations of reported incidents, the one consistent fact was K.S-A's description of the words used, "even when it could not be substantiated that those words were used.").  The Court notes that Defendant does not appear to have addressed J.S-A's testimony regarding incidents at Hilo Union, Pl. CSF, Ex. D at 25:6-18, 27:7-16.

Turning to the incident in Ms. Elloso's class, Plaintiffs allege that an entire classroom chanted at K-S.A that "you're going to hell, and your whole family's gays and whores" which caused him to cry.  Pl. CSF ¶ 16 & Ex. C at 19:21-20:5, 30:1-12, 37:10-14.  According to K.S-A, Ms. Elloso took him out

of the classroom and told him that "if [he] believed in Jesus Christ, things wouldn't happen to [him]." Id. at 37:10-38:6. However, Ms. Elloso has stated that "[t]here never was any incident in my classroom in which the class 'chanted' that K.S-A was 'going to hell and that his family is gay and whores: and that she "never told K.S-A that if he believed in Jesus, 'things like that wouldn't happen to him." Def. CSF, Declaration of Loida Elloso ("Elloso Decl.") ¶¶ 5-6. The then-principal also investigated this alleged incident and determined that no chanting or name-calling had occurred. Williams Decl. ¶ 8.

As to Waiakeawaena, there only appear to be two relevant incidents, both involving K.S-A.[6] First, K.S-A testified about an incident during the A Plus program in the cafeteria at Waiakeawaena where another student grabbed his chest and said that he was "so gay." Pl. CSF, Ex. C at 69:14-70:10. K.S-A reported this to a staff person. Id. Defendant has not disputed that this incident occurred. See Def. CSF ¶ 7.[7]

Second, K.S-A testified that in Ms. Valentin's class,

---

[6] Based on Plaintiffs' evidence, J.S-A only appears to have testified regarding incidents at Hilo Union. See generally Pl. CSF, Ex. D.

[7] Rather, Defendant merely claims that it is not responsible for after-school programs in general. Opp. at 12. However, regardless of whether A Plus is an HDOE program, it is undisputed this incident occurred at Waiakeawaena, and as discussed above Defendant appears to have some control over events occurring on school grounds.

another student called him a "fag" or "faggot."  See Pl. CSF,
Ex. C at 61:10-62:25, 64:3-23, 66:1-22.  He testified he started
crying and put his head down.  Id. at 61:10-18, 62:20-25, 64:8-
23.  He then told Ms. Valentin about the incident, and she had
him to sit at a table in the corner for about fifteen minutes
before having him return to his desk.  Id. at 61:10-18, 66:5-14.
He claims to have told the principal about this incident after
school.  Id. at 66:23-25.  However, according to Ms. Valentin,
when K.S-A told her that another student called him a "fag," she
said she would talk to the other student and there would be
consequences if that was true.  Def. CSF, Ex. D at 46:21-48:8.
K.S-A was no longer crying at this time.  Id. at 51:12-23.  Ms.
Valentin did not put K-S.A in a corner of the room.  Id. at
52:11-13.  When questioned about the incident, the student in
question denied calling K.S-A names, and several other students
who had been nearby also said they did not see or hear anything
happen.  Id. at 47:16-48:13.

     At Kua O Ka La, the only incident at issue is a
student allegedly masturbating on the bus in front of K.S-A and
following him around the school.  Pl. CSF ¶¶ 26-27.  Defendant
does not dispute that this incident occurred, but rather argues
that it is irrelevant to the question of harassment as a number
of students were impacted and the conduct was not particularly
directed at K.S-A.  Opp. at 5; Def CSF, Declaration of Gordon

Kapoula Thompson ("Thompson Decl.") ¶ 4.  At least one court has held in a Title IX claim that "sexually charged comments in a team setting, even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment." <u>Jennings v. Univ. of N.C.</u>, 482 F.3d 686, 695 (4th Cir. 2007).  Similarly, sexually charged conduct, even if not specifically directed at K-S.A., could be relevant to whether he was subjected to sex-based harassment.

Finally, Plaintiffs assert in a conclusory fashion that the claimed harassment continued at Pahoa Elementary.  Pl. CSF ¶ 30; Franklin Decl. ¶ 21.  Defendant has asserted in an equally conclusory fashion that while there have been incidents of derogatory name-calling at Pahoa, there was not harassment based on gender.  Declaration of Michelle Payne-Arakaki ("Arakaki Decl.") ¶ 11.  These assertions do not adequately inform the Court as to the nature of the conduct and surrounding circumstances for the Court to determine whether a reasonable factfinder could find harassment or whether such harassment is disputed.  Regardless, Defendant also states that Plaintiffs never attended Pahoa Elementary after they were enrolled and thus could not have been subject to harassment there.  <u>Id.</u> ¶ 10.

Reading the evidence in the light most favorable to Defendant, a reasonable factfinder could determine that while some of the alleged incidents of derogatory name-calling did

occur, they were not as frequent as Plaintiffs claim.[8]  A

reasonable trier of fact could also find that the claimed

incident in Ms. Elloso's class never occurred and no derogatory

names were used in Ms. Valentin's class.  In addition, the

factfinder could determine that Plaintiffs did not suffer any

alleged incidents at Pahoa since they never enrolled there.

Finally, a reasonable factfinder could conclude the masturbation

incident on the bus at Kua O Ka La is relevant to the question

of harassment.

Taking all this into account, a reasonable trier of

fact could conclude that Plaintiffs were not subject to severe,

pervasive, and objectively offensive harassment and rather that

the alleged incidents only constituted non-actionable occasional

name-calling and insults.  Even assuming that Plaintiffs'

understanding of these incidents is relevant to the issue of

severe and pervasive harassment, given the ages of the students

involved and the record before the Court, whether these

incidents simply constitute non-actionable name-calling or rise

to targeting on the basis of gender seems to be a fact-sensitive

inquiry more appropriate for the factfinder rather than for this

Court on summary judgment.  Accordingly, because there is a

---

[8] The Court notes that the evidence seems to show that incidents
involving K.S-A were more frequent than those involving J.S-A,
which could impact a trier of fact's conclusions of severity and
pervasiveness especially as to J.S-A.

genuine dispute of material fact on this issue, Plaintiffs'
Motion must be DENIED.

## 2. *Deprivation of Educational Opportunities*

Even if it were undisputed that the incidents to which
Plaintiffs were subject constituted severe, pervasive, and
objectively offensive harassment, such harassment must also
deprive Plaintiffs of access to the educational opportunities or
benefits provided by the school.  See Davis, 526 U.S. at 650.  A
deprivation can be found if there is a "concrete, negative
effect" on the plaintiff's ability to receive an education.  See
id. at 651, 654.  "Examples of a negative impact on access may
include dropping grades, being diagnosed with behavioral and/or
anxiety disorders, becoming homebound or hospitalized due to
harassment, physical violence, or sexual assault."  Callahan,
678 F. Supp. 2d at 1028 (internal citations omitted).

The Fifth Circuit has found a genuine dispute of fact
where there was evidence that the plaintiff suffered from
anxiety, required alternative study arrangements, and was
ultimately withdrawn and moved to another district.  Fennel v.
Marion Indep. Sch. Dist., 804 F.3d 398, 410 (5th Cir. 2015); see
also Davis v. Carmel Clay Schs., No. 1:11-CV-00771-SEB, 2013 WL
5487340, at *11 (S.D. Ind. Sept. 30, 2013), aff'd in part, 570
F. App'x 602 (7th Cir. 2014) (finding withdrawal sufficient to
establish genuine dispute).  And the Second Circuit found a

genuine dispute of fact where the plaintiff testified that because of the alleged harassment, she was unable to concentrate on her studies, felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep, even though her academic performance did not appear to suffer.  Hayut v. State Univ. of N.Y., 352 F.3d 733, 748 (2d Cir. 2003).  However, other courts have found that the mere diagnosis of psychological problems without an accompanying decline in grades or attendance has been found to not show a denial of an education opportunity.  See Gabrielle M. v. Park Forest-Chicago Heights, IL Sch. Dist. 163, 315 F.3d 817, 823 (7th Cir. 2003).

Here, Plaintiffs assert that they fell behind in school academically as a result of the harassment.  Pl. CSF ¶ 18; Franklin Decl. ¶ 27.  They also claim to have suffered emotional distress, as evidenced by crying, acting out in school, and retaliating against the alleged harassers.  Pl. CSF ¶ 17; Franklin Decl. ¶¶ 12, 27.  K.S-A appears to have been put on a Section 504 plan.  Pl. CSF ¶ 19; Def. CSF, Ex. B at 106-110.  Finally, J.S-A cut his long hair to stop being called a girl.  Pl. CSF ¶ 17; Ex. D at 37:21-40:18

The Court first notes that while Defendant has not disputed J.S-A's hair-cutting, see Def. CSF ¶ 17, Plaintiffs also have not explained, nor is it apparent, how it deprived J.S-A of access to any educational benefit or opportunity.

As to K.S-A's Section 504 Plan, Defendant has stated
that K.S-A "received a modification plan to address his
emotional and attention needs." See Def. CSF ¶¶ 18-19, Ex. B at
106-110 (504 Plan).  However, taking as true that the 504 Plan
was created to address K.S-A's emotional and attention needs,
Defendant has not provided evidence suggesting that K.S-A's
emotional and attention needs predated or had some cause other
than the alleged harassment and bullying.  At best, the 504 Plan
merely indicates that K.S-A has "experienced significant trauma
in the past," Def. CSF, Ex. B. at 106, but does not provide
details as to what this trauma was.  Regardless, diagnosis of
behavioral and anxiety disorders stemming from harassment is
evidence of deprivation of educational opportunities.  See J.B.
ex rel. Bell v. Mead Sch. Dist. No. 354, No. CV-08-223-EFS, 2010
WL 5173164, at *4 (E.D. Wash. Dec. 10, 2010) (finding genuine
dispute of fact where student was diagnosed with post-traumatic
stress disorder, anxiety disorder, and depression likely
stemming from the abuse).  There thus does not appear to be a
genuine dispute of fact that the issues leading to K.S-A's need
for a 504 plan arose from the impact of the alleged harassment.

Defendant also attempts to dispute that K.S-A acted
out in response to bullying.  In support of this dispute,
Defendant points to K.S-A's 504 Plan generally, as well as an
incident at Hilo Union in which Mr. Souza observed that K.S-A

touched another student while in line and told him that such touching was inappropriate. Def. CSF ¶ 17; Souza Decl. ¶ 9. Mr. Souza stated K.S-A then claimed that he had been called a derogatory name, even though Mr. Souza did not see any exchange of words between the students in question. Def. CSF ¶ 17; Souza Decl. ¶ 9. It is difficult to tell from Plaintiffs' evidence whether this is the only instance of physical retaliation at issue. See Franklin Decl. ¶ 12 ("K.S-A started physically retaliating against the offending students by pushing and shoving them. As a result he got reprimanded instead of the student who was harassing my son."). To the extent it is, the Court finds a genuine dispute of fact that K.S-A's actions were not in response to being called a derogatory name.

However, regardless of whether there were other instances of physical retaliation, disputed or not, the Court does not find these other instances material. It is undisputed that Plaintiffs' academic performance suffered as a result of the alleged harassment and bullying and they were withdrawn from various schools as a result of the alleged harassment and bullying, which demonstrate a negative impact on their ability to receive an education. See Callahan, 678 F. Supp. 2d at 1028 (listing dropping grades as negative impact); Carmel Clay Schs., 2013 WL 5487340, at *11 (withdrawal from schools). As such, between their academic performance, school transfers, and

emotional issues, including the need for a 504 Plan for K.S-A,
no reasonable factfinder could conclude on this record that
Plaintiffs did not suffer a deprivation of educational benefits
and opportunities due to the alleged harassment.  However, as
there is a genuine dispute of fact regarding severe, pervasive,
and objectively offensive harassment, the Court cannot find for
Plaintiffs on this element, as discussed above.

> C. Actual Knowledge

A school district is only liable under Title IX where
it has "actual knowledge" of the harassment.  See Davis, 526
U.S. at 650.  Damages cannot be awarded "unless an official who
at minimum has authority to address the alleged discrimination
and to institute corrective measures on the recipient's behalf
has actual knowledge of discrimination and fails to adequately
respond."  Gebser, 524 U.S. at 290.  "In other words, the
district is liable only for failure to address known harassment,
not for the harassment itself."  L.S. v. Tacoma Sch. Dist., No.
3:13-cv-5240-RBL, 2014 WL 1569280, at *4 (W.D. Wash. Apr. 18,
2014) (citing Mansourian v. Regents of Univ. of Cal., 602 F.3d
957, 967 (9th Cir. 2010).  "To have actual knowledge of an
incident, school officials must have witnessed it or received a
report of it."  Galster, 768 F.3d at 614.

"Although the actual knowledge standard has been
applied repeatedly by courts since Gebser [], its contours have

yet to be fully defined." <u>Callahan</u>, 678 F. Supp. 2d at 1029 (internal citation and quotation omitted). Courts have found it "difficult to define what kind of notice is sufficient." <u>Id.</u> (internal citation and quotation omitted). "The Ninth Circuit has not yet resolved the precise boundaries of the 'actual notice' component of a Title IX claim." <u>S.T. v. Yakima Sch. Dist. No. 7</u>, No. 11-CV-3085-TOR, 2013 WL 807197, at *7 (E.D. Wash. Mar. 5, 2013).

Courts in this circuit have determined that there is "no requirement that the appropriate district officials observe prior acts of a sexual nature against Plaintiff himself to establish 'actual knowledge' under Title IX; rather the test is whether the appropriate official possessed enough knowledge of the harassment that he or she reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." <u>Callahan</u>, 678 F. Supp. 2d at 1030-32 (finding genuine dispute where there were conflicting interpretations of whether the school official who witnessed a particular incident, which did not involve the plaintiff, knew it was sexual in nature).

Plaintiffs here assert that they reported the allegedly harassing incidents to school officials on multiple occasions, and some of the incidents occurred in the presence of administrators, teachers, and counselors. Pl. CSF ¶¶ 8-9. Mr.

Franklin stated that incidents at Hilo Union were reported to Ms. Stieger, Principal Spencer, Vice Principal Souza, and Ms. Elloso. Franklin Decl. ¶¶ 3-8, 13-16; Ex. E at 47:14-22. Mr. Franklin also stated that he complained about the masturbation incident on the bus to Kua O Ka La, and discussed harassment with the principal of Pahoa Elementary. Franklin Decl. ¶¶ 18, 22. K.S-A testified that he reported incidents to teachers, a school counselor, and a principal, and teachers knew about the incident of physical violence at Hilo Union.[9] Pl. CSF, Ex. C at 42:25-43:9; 49:8-25; 52:2-16; 57:11-23; 62:20-25. J.S-A also testified that he reported several incidents to teachers. Pl. CSF, Ex. D. at 28:24-29:24; 39:1-17.

Defendant notably does not argue lack of knowledge in its Opposition. However, based on its concise statement of facts, it appears to dispute knowledge of at least some of the incidents at Hilo Union, though it does not appear to dispute

---

[9] Plaintiffs also point to the incident in Ms. Elloso's class. Pl. CSF ¶ 8; Ex. C at 23:8-24:1. However, Defendant disputes that this incident occurred. Def. CSF, Elloso Decl. ¶¶ 5-6. In addition, according to Defendant, Mr. Franklin met with Ms. Williams less than two weeks after the alleged chanting incident allegedly occurred, but only discussed his concern that Ms. Elloso was "picking on" K.S-A and did not mention the alleged chanting. Def. CSF, Williams Decl. ¶ 4. This evidence further supports that Defendant lacked knowledge of this incident, at least around the time it allegedly happened.

knowledge of the incident at Kua O Ka La.[10]  Def. CSF ¶¶ 8-9.

First, Ms. Andrade-Spencer stated that while she was principal,

K.S-A did not report harassment directly to her.  Spencer Decl.

¶¶ 7, 9.  However, Ms. Andrade-Spencer did meet with Mr.

Franklin on "numerous occasions regarding various concerns

relating to his sons, particularly K.S-A," including with

respect to Ms. Stieger's class.  Id. ¶ 6.  Ms. Andrade Spencer

does not provide any additional detail as to what Mr. Franklin's

"concerns" were, but presumably she did not take anything Mr.

Franklin said to be harassment on the basis of gender, as she

states in a conclusory fashion that if "any misconduct occurred

[she] would have investigated and taken the appropriate action

to correct any misconduct."  Id.

       Defendant also relies on Mr. Souza, who stated that

while he was vice principal at Hilo Union, he had several

conversations with Mr. Franklin regarding his sons.  Souza Decl.

¶ 5.  While Mr. Souza does not provide detail regarding those

conversations, he stated that "Mr. Franklin seemed very happy

with Ms. Stieger," K.S-A's teacher at the time.  Id.  However,

_____

[10] It is not clear whether Defendant disputes having knowledge of
incidents at other schools.  Since Defendant has taken the
position that no harassing incidents involving Plaintiffs
occurred at Pahoa, Arakaki Decl. ¶ 10, presumably it does not
believe it could have had knowledge.  The Court notes, however,
that there is evidence that Ms. Payne-Arakaki generally knew
about incidents of derogatory name-calling at Pahoa.  Id. ¶ 11.

Mr. Souza also stated that K.S-A reported incidents of being called "fag," "faggot," and queer." Id. ¶¶ 6, 8.  Although Mr. Souza indicates that not all instances of name-calling could be substantiated, his declaration shows that he was aware of K.S-A's reports of derogatory name-calling.  Id.

Finally, Defendant relies on Ms. Williams, who was the vice principal of Hilo Union from July 2007 to July 2014 and principal from July 2014 to October 2015.  Williams Decl. ¶ 1. Ms. Williams stated that neither Mr. Franklin, K.S-A, or J.S-A reported to her that Plaintiffs had been bullied or harassed, and that she did not see any students bullying or harassing Plaintiffs.  Id. ¶¶ 9, 10.  However, Ms. Williams stated she is aware of five times when K.S-A was involved in a "name-calling incident."  Id. ¶ 11.  Ms. Williams also stated she learned of Mr. Franklin's allegations of bullying and/or harassment on March 31, 2015, Williams Decl. ¶ 6, the day before Plaintiffs stopped attending Hilo Union.  See Def. CSF ¶ 1.

If all Plaintiffs or Mr. Franklin had reported were "concerns," such as Ms. Andrade-Spencer stated, such reports would not be sufficient for a reasonable trier of fact to find actual knowledge.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1120 (10th Cir. 2008) (finding insufficient reports that boys were "bothering" plaintiff insufficient).  However, Defendant's evidence shows that vice

principals[11] at Hilo Union were aware that K.S-A reported or was involved in some incidents of derogatory name-calling.  A school district need not have actual knowledge of every incident, as long as there is actual knowledge of enough incidents for it to respond.  See Crandell v. N.Y. Coll. of Osteopathic Med., 87 F. Supp. 2d 304, 320 (S.D.N.Y. 2000) (finding plaintiff's reports did not provide knowledge of issues at hospitals other than the one she identified).

Although school officials may not have subjectively viewed these incidents as gender-motivated harassment, no reasonable factfinder could conclude that they did not have actual knowledge of reports of these incidents.[12]  See W.H. v.

_____

[11] The Court notes that neither party discusses whether vice principals would have authority to address the alleged discrimination and institute corrective measures.  However, Mr. Souza states that he had responsibility for the discipline of students and supervision of teachers.  Def. CSF, Souza Decl. ¶ 2.  Ms. Williams also states that as principal she was responsible for the administration and management of the school, teachers, staff, pupils, and other services.  Def. CSF, Williams Decl. ¶ 2.  There does not appear to be a genuine dispute that Mr. Souza and Ms. Williams are officials who can be held to have actual knowledge on behalf of the school district.

[12] The Court also notes that the compliance report issued by the U.S. Department of Education, Office of Civil Rights ("OCR") regarding the Hawaii Department of Education may bolster Plaintiffs' case that Defendant was aware of similar incidents of bullying and harassment.  See Reply at 11 & Ex. A.  That report found that over half of students who had been bullied or harassed reported the harassment to a school employee, and nearly two-thirds of the reported incidents involved alleged bullying or harassment based on a protected category.  Reply, Ex. A at 3.  However, because the report does not detail how (Continued...)

Olympia Sch. Dist., No. C16-5273 BHS, 2017 WL 3581632, at *5
(W.D. Wash. Aug. 18, 2017), reconsideration denied, No. C16-5273
BHS, 2017 WL 4408034 (W.D. Wash. Oct. 4, 2017) (denying school
district's motion for summary judgment because a reasonable jury
could find that they had knowledge of conduct consist with
sexual grooming techniques); Brodeur v. Claremont Sch. Dist.,
626 F. Supp. 2d 195, 207 (D.N.H. 2009) (denying defendant's
motion for summary judgment where plaintiffs described allegedly
harassing comments to school counselor who reported them to the
principal); see also Zeno v. Pine Plains Cent. Sch. Dist., 702
F.3d 655, 668 (2d Cir. 2012) (affirming jury's finding of actual
knowledge in Title VI case where school district received
numerous reports over time regarding harassment of plaintiff).

D. Deliberate Indifference

As other courts have recognized, the deliberate
indifference inquiry generally does not lend itself well to a
determination by the Court on summary judgment. See Doe A. v.
Green, 298 F. Supp. 2d 1025, 1036 (D. Nev. 2004); Lilah R. ex
rel. Elena A. v. Smith, No. C 11-01860 MEJ, 2011 WL 2976805, at

---

many of those incidents involved sex or sexual orientation, much
less facts similar to those at issue here, it is difficult to
find that the report itself establishes awareness enabling
school officials to take remedial action, even assuming the
report is admissible. See Reply at 15 n.8 (arguing that it is
admissible under the public-records exception to hearsay and as
a self-authenticating document).

*5 (N.D. Cal. July 22, 2011).  A school district is only liable for damages under Title IX where it remains deliberately indifferent to known acts of harassment.  <u>Callahan</u>, 678 F. Supp. 2d at 1035 (citing <u>Davis</u>, 526 U.S. at 642-43).  Deliberate indifference requires that the school's response to harassment was "'clearly unreasonable in light of the known circumstances.'" <u>Oden v. N. Marianas Coll.</u>, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting <u>Davis</u>, 526 U.S. at 648).  In other words, the question is whether the school "made 'an official decision...not to remedy the violation.'"  <u>Id.</u> (quoting <u>Gebser</u>, 524 U.S. at 290) (alteration in original).

"[S]chool administrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment."  <u>S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.</u>, 819 F.3d 69, 77 (4th Cir. 2016).  "[A] school's actions do not become 'clearly unreasonable' simply because a victim or his parents advocated for stronger remedial measures."  <u>Id.</u>  "An aggrieved party is not entitled to the precise remedy that he or she would prefer." <u>Oden</u>, 440 F.3d at 1089.  "If an institution 'takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment.'"  <u>Green</u>, 298 F. Supp. 2d at 1034-35 (quoting <u>Willis v. Brown Univ.</u>, 184 F.3d 20, 26 (1st Cir. 1999)).

However, if "an institution either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination." Id. (citing Gebser, 524 U.S. at 290). A school district can be liable if it continues to use the same ineffective method of remedying the harassment to no avail. Vance, 231 F.3d at 262. A school district which becomes aware that its initial response is ineffective cannot "drag[] its feet" or take only "half-hearted measures" in further addressing the discrimination. See Zeno, 702 F.3d at 669-70. However, even where harassment continues, escalating disciplinary sanctions and taking other protective measures can preclude a finding of deliberate indifference. See S.B., 819 F.3d at 77 (granting summary judgment to defendant).

### 1. *Response to Reported Incidents of Harassment*

Plaintiffs first argue that Defendant was deliberately indifferent because to the extent Defendant addressed the incidents, its response was minimal and ineffective. Mot. at 26-29. In particular, Plaintiffs assert that no disciplinary actions were taken towards alleged harassers; in particular, Plaintiffs assert that Ms. Elloso counseled K.S-A to believe in Jesus, and the incident in Ms. Valentin's class went unaddressed. Id. at 27. Ms. Valentin also did not log this

incident because she felt there was nothing she could write down. Pl. CSF, Ex. G at 49:1-25. In addition, only some of the action items arising from a formal complaint of discrimination Mr. Franklin filed with the Department of Education were taken.[13] See Pl. CSF, Ex. F at 87:22-25 & Dep. Ex. 13.

---

[13] The Court notes that Plaintiffs also rely on the OCR compliance review as evidence of deliberate indifference. Reply at 9-15. Some of the report's findings appear to track the issues Plaintiffs raise here, such as that only 20% of principals and vice principals received training on relevant civil rights laws, Reply, Ex. A at 6 n.5, the lack of documentation and record-keeping regarding harassment allegations, id. at 4-5, the general lack of responsiveness to such allegations, id. at 3.

Even assuming this document is admissible, however, its relevance on summary judgment is not apparent. That the OCR found that many principals were not trained and many allegations were not adequately reported, investigated, or handled, does not prove that those issues are present in this case. As best as this Court can tell, Plaintiff appears to be relying on the OCR report for added weight and credibility, but those are issues the Court cannot consider on summary judgment. To the extent Plaintiffs may be attempting to argue that the failure to comply with Title IX reporting requirements and grievance procedures itself evidences deliberate indifference to harassment, such evidence may be relevant but does not foreclose the possibility of genuine disputes of fact. In sum, Plaintiffs have not made clear how the Court should consider the OCR report in the context of the deliberate indifference inquiry.

Similarly, the relevance of Plaintiffs' exhibit entitled "LGBTQ Youth: An Educator's Guide" (Pl. CSF, Ex. A) is not apparent, as they rely on it for various statistics about LGBTQ students generally. See Pl. CSF ¶¶ 44-46. Defendant objects to this document as inadmissible. Opp. at 8-9. Numerous courts appear to have concluded that documents produced in discovery and offered by the opposing party are admissible on summary judgment. See, e.g., Anand v. BP West Coast Prods. LLC, 484 F. Supp. 2d 1086, 1092 n.11 (C.D. Cal. 2007); see also Welenco, Inc. v. Corbell, 126 F. Supp. 3d 1154, 1163 (E.D. Cal. 2015); Evangelical Lutheran Good Samaritan Soc'y v. IPCR, LLC, Civ. No. (Continued...)

Defendant asserts that "all necessary actions" were taken when it was informed of incidents involving Plaintiffs. Opp. at 12-13. The record shows that many of the teachers and administrators stated that they would have or did investigate any incidents reported to them and took or would have taken "appropriate" actions, such as disciplinary consequences, if "warranted." See Spencer Decl. ¶¶ 5-7, 9; Souza Decl. ¶ 6; Williams Decl. ¶ 10; Elloso Decl. ¶ 4; Thompson Decl. ¶¶ 4, 9. However, "[d]etermining what constitutes appropriate remedial action for allegations of discrimination in Title IX cases will necessarily depend on the particular facts of the case." Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380, 384 (5th Cir. 2000) (internal citation and quotation omitted). Statements such as the ones above that "appropriate" investigations, disciplinary actions, and consequences were or would be taken are too conclusory to allow a factfinder to determine whether what was done was in fact appropriate.

Nevertheless, other portions of the record contain more factual detail about how some of the teachers and administrators responded to incidents of harassment which was

---

12-00177 KSC, 2013 WL 12120528, at *4 (D. Haw. July 25, 2013). However, regardless of its admissibility, it is not clear how the Court should be considering this evidence in the context of Plaintiffs' Motion as presented here.

reported to them or of which they were aware.[14]  With respect to
the incident in Ms. Valentin's classroom, she noticed K.S-A
acting differently, asked him what was going on, and provided
him space to tell her in his own time.  See Def. CSF, Ex. D at
46:21-47:5.  When K.S-A began shouting at her from across the
room, she asked him to come over and talk to her.  Id. at 47:6-
15.  When he reported that another student called him a "fag,"
she said she would talk to the other student and that there
would be consequences if that was true.  See id.  Ms. Valentin
then spoke with the student in question, as well as several
others who had been nearby, none of whom heard anything said to
K.S-A.  Id. at 47:16-48:5.  Ms. Valentin did not create a
written report regarding this incident.  Id. at 52:14-22.  While
Plaintiffs may disagree with the conclusions of Ms. Valentin's
investigation of this incident, that does not mean that the
steps she took were unreasonable in light of the circumstances,
especially taking into account the students' ages and the
context.  And while the failure to log the incident may have
been regrettable,[15] whether that shows deliberate indifference is
a question of fact.

---

[14] For summary judgment purposes, this does not include the
incident in Ms. Elloso's class, because according to her, that
incident never occurred.  Elloso Decl. ¶¶ 5-6.

[15] Plaintiffs suggest that Ms. Valentin's actions contravened
Hawaii Administrative Rules § 8-19-19 by requiring that K.S-A's
(Continued...)

There is also evidence Ms. Williams was responsive.
When Mr. Franklin raised concerns about Ms. Elloso "picking on"
K.S-A, K.S-A was transferred to another class.  Def. CSF,
Williams Decl. ¶¶ 4-5.  Ms. Williams also contacted Hilo Union's
staff after she learned about Mr. Franklin's allegations of
bullying, and conducted an investigation into the incident in
Ms. Elloso's classroom.  Id. ¶¶ 7-8.  In addition, action was
taken in response to each of the five incidents of name-calling
of which Ms. Williams was aware: mutual apologies in two,
offending students apologizing to K.S-A in two, and counseling
for both students in the last.  Id. ¶ 11.

As to the other administrators at Hilo Union, Mr.
Souza stated that he conducted investigations when K.S-A
reported incidents at Hilo Union by attempting to get both sides

claim be corroborated by another student.  See Mot. at 27.
However, that section simply requires a teacher, among others,
who either witnesses or has reasonable cause to believe that
certain offenses were committed to report the incident to the
principal.  Haw. Admin. R. § 8-19-19(a).  Here, if Ms. Valentin
did not have reasonable cause to believe that such an offense
was committed, it does not appear that she was required to
report it under this rule, even if an allegation of such an
offense was made.
    Nevertheless, the Court notes that where an investigation
yields inconclusive results, a school may still find corrective
action such as monitoring or admonishing an accused student
warranted out of an abundance of caution.  See Doe v. Sch. Bd.
of Broward Cty., Fla., 604 F.3d 1248, 1262 (11th Cir. 2010).
However, whether such precautions were warranted here, or
whether the actions Ms. Valentine took here were clearly
unreasonable is a question of fact which the Court cannot
resolve on summary judgment.

of the story from the students involved and talking to witnesses.  Def. CSF, Souza Decl. ¶ 8.  He also stated that he informed Mr. Franklin of the investigations.[16]  Id. ¶ 10.  While Mr. Souza's testimony is not specific to particular incidents, it constitutes some evidence showing how he handled reported incidents involving K.S-A.  And in the one incident involving K.S-A of which Ms. Andrade-Spencer was aware, she counseled the other student she did not have to like K.S-A, but both students had to be tolerant of each other.  Def. CSF, Spencer Decl. ¶ 8.

Finally, the principal of Kua O Ka La stated that "appropriate consequences" were given to the offending student involved in the bus masturbation incident.  Def. CSF, Thompson Decl. ¶ 4.  And, after Mr. Franklin reported an incident at the community center, the school reminded teachers to be vigilant in supervising students.  Id. ¶ 6.

---

[16] Mr. Souza did not inform Mr. Franklin of the results of the investigations.  Def. CSF, Souza Decl. ¶ 10.  However, while Mr. Franklin might have liked to know the results of these investigations, the privacy rights of the students in question are also implicated.  See Galster, 768 F.3d at 621 (finding that while the plaintiff's family "understandably would have liked to know what was happening in the boys' expulsion hearings, school officials also had to respect the privacy rights of the disciplined students" and citing state laws  protecting student confidentiality).  Plaintiffs have not shown that Mr. Franklin had a right to know the results of the investigations, and a trier of fact could find keeping such details about the investigations confidential does not evidence deliberate indifference.

Plaintiffs posit that this case is similar to <u>Vance</u>, 231 F.3d 253 (6th Cir. 2000), because deliberate indifference was found where the only action taken was speaking to the offending students in question and no discipline was meted out. <u>See</u> Mot. at 28. However, that case involved middle school students whose harassing conduct involving stabbing the plaintiff in the hand and attempted to rip off her clothes, and the plaintiff's mother filed a formal Title IX complaint which was never investigated. 231 F.3d at 262.

Without trivializing the seriousness of Plaintiffs' allegations, the factual circumstances in <u>Vance</u> are different than what occurred here, viewing the evidence in the light most favorable to the Defendant. A reasonable trier of fact could find that difference in the ages of the students involved and the nature of the alleged harassment are relevant facts that could render simply talking to students, even repeatedly over time, an appropriate response from Defendant based on the circumstances it knew about. Moreover, unlike in <u>Vance</u>, Plaintiffs' formal Title IX complaint was investigated, and at least some of the recommended action items resulting from that investigation were taken. Def. CSF, Ex. F at 86:6-87:25. In combination with the evidence above supporting that principals and teachers did take some action in response to Plaintiffs' reports of harassment, the Court cannot conclude that there was

an official decision not to address the harassment such that a reasonable trier of fact would have to find deliberate indifference from the undisputed facts.

### 2. *Lack of LGBTQ-Specific Training*

Finally, Plaintiffs argue that there is deliberate indifference because no training on LGBTQ issues was ever provided, relying on Simpson v. University of Colo. Boulder. Mot. at 29-31. In that case, the court determined that deliberate indifference can be found where the school fails to "provid[e] adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." 500 F.3d 1170, 1178 (10th Cir. 2007). The court found it significant that the school had actively supported a program which "without proper control, would encourage young men to engage in opprobrious acts," which distinguished the case from Davis and Gebser. Id. at 1177.

In assessing allegedly inadequate training, the Court is mindful that "the question is not whether the relevant [school] administrators could have been trained better, but whether a reasonable juror could conclude on the evidence that any inadequacies in training were so deficient that they constituted 'encouragement of the [harassing] conduct' or otherwise amounted to deliberate indifference." Doe v. Emerson Coll., 271 F. Supp. 3d 337 (D. Mass. 2017) (quoting Simpson, 500

F.3d at 1177) (alteration in original).  Here, unlike in
Simpson, there does not appear to be any evidence suggesting
that Defendant created a situation which would encourage
harassing conduct such that it needed to provide further
training and policies to prevent such conduct from occurring.
Plaintiffs' reliance on Simpson therefore seems inapposite at
the outset.

        Setting aside the lack of evidence of encouragement by
Defendant generally, whether the failure to provide a particular
training is clearly unreasonable depends on the circumstances,
even if that training could benefit students in a protected
class.  See Doe v. Los Angeles Unified Sch. Dist., No. 2:16-cv-
00305-CAS-JEMX, 2016 WL 4238636, at *5 (C.D. Cal. Aug. 8, 2016)
(finding failure to provide racial sensitivity training was not
clearly unreasonable under the circumstances and dismissing
Title VI race discrimination claim).

         Here, Plaintiffs claim that the lack of training on
LGBTQ harassment shows deliberate indifference and cite to the
testimony of Katherine Tolentino, Defendant's 30(b)(6)
representative, that more training was needed on LGBTQ issues,
as nothing had been done locally or in an organized format by
the state.  Mot. at 30; Pl. CSF, Ex. F at 64:2-17, 67:1-9.  The
first LGBTQ specific training was not provided until early 2015,
was optional, and related to same-sex bathroom issues.  Pl. CSF

¶¶ 33-34; see also Ex. F at 18:6-9.  Plaintiffs' evidence

implies that such training was needed, as Ms. Valentin stated

that she could not recall ever being provided anti-bullying

training, and did not know what LGBTQ stood for.  Pl. CSF, Ex. G

at 12:23-13:2, 15:6-12.  Ms. Tolentino also appears to have

testified that a child must in fact belong to a protected class

for name-calling to constitute harassment.[17]  See Pl. CSF, Ex. F

at 32:7-20.  However, as discussed above, a Title IX claim can

be based on either actual gender or perceived nonconformance

with gender stereotypes.

While Defendant admits that it does not have a

separate training program to address LGBTQ issues specifically,

it asserts that training is provided regarding nondiscrimination

on sex, age, disability, sexual orientation and gender

expression.  Opp. at 12-13.  Ms. Tolentino testified that there

is an optional nondiscrimination training available to

principals, vice principals, and certain others, but not

teachers.  Def. CSF, Ex. E at 13:15-14:22.  The record also

shows that one principal stated she received consistent, annual

_____

[17] The Court notes that while Ms. Tolentino was a 30(b)(6)
witness for Defendant, the record does not show whether Title
IX's legal requirements was a subject for which she was
designated to testify or whether she had any notable knowledge
or experience regarding Title IX.  As such, it is difficult to
find that Ms. Tolentino's statement should be taken as the
position of Defendant on this issue.

training regarding harassment and bullying of protected classes.
See Arakaki Decl. ¶ 4. Teachers were also provided with
information discussing the policy on non-discrimination and
expected to view a video which includes a section on anti-
bullying training. Def. CSF, Ex. E at 14:23-15:15, 16:21-17:6.
While the extent of discussion regarding the non-discrimination
policy depended on individual schools, id. at 15:8-15, the
record supports that relevant training and guidance was
generally provided. Based on this record, a reasonable trier of
fact could conclude that the failure to provide LGBTQ-specific
training was not clearly unreasonable under the circumstances so
as to constitute deliberate indifference.

In light of the above, the Court finds that Defendant
has sufficiently cast doubt on whether it was deliberately
indifferent to known incidents of harassment to survive summary
judgment. A reasonable trier of fact could conclude that
Defendant took reasonable measures to address the incidents it
knew about. Accordingly, Plaintiffs' Motion must be DENIED.

## CONCLUSION

For the foregoing reasons, the Court DENIES
Plaintiffs' Motion for Partial Summary Judgment, ECF No. 109.

IT IS SO ORDERED.

Dated: Honolulu, Hawai'i, May 9, 2018.



_____
Alan C. Kay
Sr. United States District Judge

K.S-A et al v. State of Hawaii, Department of Education, Civ. No. 16-00115 ACK-KJM, Order Denying Plaintiffs' Motion for Partial Summary Judgment.